Filed 2/15/23  P. v. Bowen CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BLAKE LOUIS BOWEN,<br><br>    Defendant and Appellant. | B306889<br><br>(Los Angeles County<br>Super. Ct. No. BA475606) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Ray G. Jurado, Judge.  Reversed and remanded with directions.

James Koester and Berangere Allen-Blaine, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising

Deputy Attorney General, and David A. Wildman, Deputy Attorney General, for Plaintiff and Respondent.

_____

## INTRODUCTION

After a first trial ended in a hung jury, a second jury convicted Blake Louis Bowen of a single count of stalking (Pen. Code, § 646.9).[1]  During the second trial Bowen repeatedly sought *Marsden*[2] hearings in an effort to replace his court-appointed counsel.  At the start of one such hearing, after the jury returned a guilty verdict but prior to sentencing, the trial court declared a doubt as to Bowen's competency to assist his counsel or stand for sentencing.  The court suspended criminal proceedings and appointed two doctors to examine Bowen and opine regarding his competency.  The court declined to consider any *Marsden* motion pending a determination of Bowen's competency.  Weeks later, without an informed opinion from either doctor, or an evidentiary hearing or trial, the court reversed its declaration of doubt as to Bowen's competency.  The court then refused to hear or rule on Bowen's request to replace his counsel and ordered him removed from the courtroom.  With Bowen absent, the court denied his

_____

[1]     All further statutory references are to the Penal Code.

[2]     Originating with the seminal decision in *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), litigants and courts now short-handedly reference a "*Marsden* motion" as the request a defendant makes for a new appointed lawyer that triggers the right to a confidential hearing outside the presence of the prosecutor.

new trial motion and sentenced him to the upper three-year state prison term.

Bowen appeals from that judgment. Bowen contends (1) we must reverse the judgment due to ineffective assistance of counsel and prosecutorial misconduct; (2) the court erred by deciding the new trial motion and sentencing Bowen in his absence; (3) the sentence violates the Eighth Amendment prohibition on cruel and unusual punishment; and (4) the court erred by not hearing his *Marsden* motion. In addition, during the pendency of this appeal Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) modified the sentencing law by, among other changes, requiring a defendant to stipulate to, or the jury to find true beyond a reasonable doubt, any facts underlying any circumstance in aggravation before the court imposes an upper term. In supplemental briefing, the parties agree Senate Bill No. 567 applies to Bowen retroactively, but they disagree as to whether the new law requires resentencing here.

Finding no ineffective assistance of counsel, prosecutorial misconduct, or error in excluding Bowen from the hearing on the new trial motion, we affirm the conviction. However, we reverse the judgment and remand with directions to resentence Bowen pursuant to the newly amended section 1170, subdivision (b)(2), and any other newly enacted ameliorative legislation. Since the issues may arise again on remand, we also provide guidance for the trial court with respect to the court's improper refusal to hear Bowen's *Marsden* motion or conduct a competency hearing or trial.

# FACTUAL AND PROCEDURAL HISTORY

A. *Bowen's Underlying Offense and the First Trial*

Bowen briefly dated Lydia W. When she ended the relationship in November 2018, he unleashed a torrent of abusive text messages and phone calls toward her, her family, her friends and, ultimately, even her co-workers. Scared, Lydia left town, blocked Bowen's phone number, stopped leaving her apartment, and bought pepper spray, among other countermeasures. Bowen continued to harass Lydia through social media and alternative phone numbers, at one point calling her 73 times in one day.

Bowen set up at least 24 fake online dating profiles in Lydia's name. The profiles solicited sex in vulgar terms, with the result that random, strange, men appeared at Lydia's apartment lobby expecting sex. Bowen messaged Lydia on social media threatening to send more men to her apartment if she did not call him.

On January 25, 2019, Lydia secured a permanent restraining order against Bowen. By information filed August 7, 2019, the People charged Bowen with stalking, in violation of section 646.9. The information did not allege any prior conviction or other sentencing enhancement allegations, and the court did not instruct the jury on any. A two-week jury trial commenced on October 7, 2019 and ended in a hung jury and mistrial.

B. *The Second Trial*

The case proceeded to trial for a second time on February 11, 2020. Bowen requested his first *Marsden* hearing on February 18, 2020, claiming ineffective assistance by his counsel, deputy public defender Lloyd Handler. The court denied

4

the motion. After Lydia testified as summarized above, Bowen testified in his own defense. He claimed that his mother suffered from bipolar disorder and severe depression, resulting in hospitalization, which required Bowen to care for his younger siblings.

Forensic psychologist Dr. Lydia Bangston also testified for the defense. Dr. Bangston originally had examined Bowen prior to the first trial. After that initial assessment, Dr. Bangston concluded Bowen "didn't exhibit any signs or symptoms of any major mental disorder such as a mood disorder, organic disorder or psychotic disorder" and that his thought process was "logical" and not delusional. At the time, Dr. Bangston believed Bowen "didn't meet the full criteria for either personality disorder, narcissistic or borderline." Dr. Bangston later prepared a second report based on letters and other materials received from people who knew Bowen. The letters contained information about childhood trauma—risk factors for certain personality disorders—undisclosed by Bowen in his prior meeting with Dr. Bangston. Again, Dr. Bangston did not diagnose Bowen with any mental disorder.

Dr. Bangston met with Bowen a third time for an hour in January 2020, in advance of the second trial. On February 13, 2020, Dr. Bangston issued her third report. Now armed with the additional materials provided by Bowen's friends and having heard from Bowen essentially the same history he conveyed in his trial testimony, Dr. Bangston associated the type of childhood trauma suffered by Bowen with certain types of psychological disorders. While she did not "formally" diagnose Bowen (she would need more time for that), she did opine that he exhibited "a number of characteristics" of narcissistic personality disorder and

borderline personality disorder, which "impair[ed] his functioning."

On February 28, 2020, the second jury convicted Bowen of one count of stalking, and the court remanded him with no bail pending sentencing. As before, the court did not instruct the jury or elicit any finding on any sentencing enhancements.

C. *Bowen's Post-conviction Conduct and Requests for New Counsel*

On March 9, 2020, while awaiting sentencing, Bowen again sought to replace Handler. The court convened another *Marsden* hearing that went nearly an hour. Bowen came prepared with an eight-page list of issues. Those issues included Bowen's perceived lack of merit in the People's case, prosecutorial misconduct, and the ineffectiveness of his counsel for failing better to exploit those issues. Bowen claimed that the police falsified the original report leading to his arrest, a conspiracy his lawyer had failed to uncover. He further claimed Handler failed properly to impeach Lydia with perceived inconsistencies in her testimony. The court denied the *Marsden* motion, finding Bowen was "nitpicking at so many different things. [He didn't] have a perspective of this case, a proper perspective on this case, the strength of this case, [his] attorney's performance."

On April 22, 2020, the People filed their sentencing memorandum seeking a three-year suspended sentence and five years on probation. The court continued Bowen's sentencing hearing due to his COVID-19 quarantine status.

Handler then sought a bail hearing on April 29, 2020, because more than 60 days had passed since the jury verdict without a sentencing hearing. In advance of the April 29

hearing, Bowen wrote the court complaining about Handler: "He is the worst attorney I've ever come across and why I tried to fire him two times now and will attempt to again as I have many additional reasons why he should be discharged."  The court construed the letter as a request for a *Marsden* hearing, but Handler represented that he and Bowen agreed that if the court heard the bail motion and released Bowen, then Bowen would defer his *Marsden* motion.  The court overruled that proposal, stating, "The *Marsden* is a *Marsden,* and I believe it takes precedence over any other legal ruling or issue."  At the ensuing *Marsden* hearing, however, Bowen requested time to review the "50 or so letters" he had written to his counsel "in order to make an exhaustive *Marsden* motion, listing all the reason[s] of ineffective assistance."  The court granted Bowen's request "to continue the *Marsden* hearing to a short convenient date."

Without ruling on the *Marsden* motion, the court went back into general session to hear the bail motion.  Handler sought Bowen's release due to his time spent in custody (approximately 14 months at that point on a maximum 36-month sentence), the failure to sentence Bowen within 60 days, and Bowen's potential exposure to COVID-19 while in custody.  In the course of extended argument on the bail motion, the court asked if Bowen would agree to the People's recommended sentence of, among other terms, a suspended upper term with five years of probation, domestic violence classes, and a waiver of all back time (by then over a year of actual time in custody).  The People urged the court to sentence Bowen that day, then grant his release into probation.

The court denied the bail motion and scheduled the *Marsden* hearing for 1:30 p.m. that same day, giving Bowen "several hours" to prepare for the hearing.

D. *The Court Declares a Doubt as to Bowen's Competency To Stand Trial, Then Changes Its Mind*

At 1:30 p.m. on April 29, 2020, the court reconvened for Bowen's third *Marsden* hearing. After some discussion about limiting Bowen to issues that had arisen since the extended *Marsden* hearing six weeks prior, Bowen raised what he characterized as "something more important" than "all the specifics of the legal issues that [counsel] is ineffective on:"

> "[Bowen]: On the day that I testified, the multiple days leading up to it, I was being trailed, followed by, and harassed by shadow people. The shadow people are multi-dimensional creatures who can take any shape or form. They're also a superior being that are secretly in control of the nature and controlling powers of the world – highest ranking members of the U.S. intelligence agencies, NSA, CIA, Special Operations Systems Black Letter, and even hired insurgents in the so-called social justice movements.

> "These are the leaders, that is, Gloria Steinem-type characters funded by multi-dimensional beings like George Soros and others and sometimes mistakenly masonic. These are creatures or beings that controlled me and are not known to man because they can take any form any time. Some call them

shape shifters.  These are those all the way from Bilderberg Group that meet annually to decide the fate of the world and the fate of the world – people that have – that meet annually to decide the fate of the world and people they have close watch over it to more relaxed yet very private Bohemian Grove retreats where these same people engage in homosexual orgies with young boys, homosexual pedophilia being their most desired bias or pleasure. Dick Cheney along with the Clintons and Bush senior and junior attend such pagan retreats where they actually worship a 60-foot stone owl named Enoch, their God of Wisdom."

Bowen accused Handler of serving as a "helper for the shadow people" and identified the prosecutor as "a high-ranking shadow person in female form . . . .  This is all on record."  Bowen explained, "Even though there was three hours that I had to sleep, for the four nights before my testimony, the shadow people would not let me sleep, oftentimes sending electric impulses to the RFID chip they implanted in my brain many years ago.  It is why I have a misshaped head."

Handler asked if the court would declare a doubt as to Bowen's competency, effectively explaining that he, Bowen's counsel, had not previously "seen any sign of psychotic illness" or "any sign of psychotic symptomology" and had no reason (other than what Bowen had just said) based on speaking with Dr. Bangston and people who knew Bowen, and based on conversations with Bowen that very morning, to suspect a

condition other than the personality disorders described by Dr. Bangston.

The court explained, "I've seen many, many defendants who have presented in the court with mental health conditions that have been confirmed by doctors. I believe that what Mr. Bowen has just said about shadow people, shape shifters, and elite world order – all of these forces in his opinion that have conspired against him, I believe that he believes these things; therefore, based on some of the things that he just said, I find a doubt under Penal Code Section 1368 as to his competency to stand for sentencing."

After discussing the appointment of a doctor to examine Bowen, the court ended the confidential portion of the proceeding without ruling on the *Marsden* motion. In response to questions from the court clerk and Bowen about a *Marsden* ruling, the court responded only to Bowen that "I have a doubt as to your mental health." The court appointed Dr. Bangston and Dr. Kory J. Knapke to evaluate Bowen.

The parties reconvened on May 28, 2020, without Bowen due to a COVID-19 quarantine in the jail. Handler reported that neither appointed doctor had yet evaluated Bowen, explaining that it could take another two weeks for the quarantine to lift so that the doctors could evaluate Bowen. The court set a further date of June 11. The question then arose as to the status of Bowen's most recent *Marsden* motion, pending for a month at that point. As Handler explained, "I have spoken to Mr. Bowen at length in the intervening time since we were last in court together, and I've gotten a number of messages from him. And I know it's his desire to speak to the court at length about a number of different issues. [¶] Should I pass on to him that his

10

ability to do that would be contingent on getting through this evaluation process?" The court responded, "Excellent suggestion."[3] The court set June 29, 2020, for receipt of the reports from Drs. Bangston and Knapke.

On June 29, 2020, the court received a letter from Dr. Knapke but no report from Dr. Bangston. It also had four new letters from Bowen. Dr. Knapke's letter indicated—and Bowen confirmed in no uncertain terms—that Bowen refused to meet with any doctors "as long as I'm being represented by a criminal attorney." Dr. Knapke indicated he had reviewed various materials, including Dr. Bangston's three reports, Bowen's trial and protective order hearing testimony, and various police reports and interview transcripts. Although appointed for the purpose of evaluating Bowen's competency, Dr. Knapke instead relied on a legal presumption for his conclusion: "Because Mr. Bowen refused to participate in this clinical interview, I am unable to overcome the presumption that Mr. Bowen is competent to stand trial."

Bowen objected to discussing Dr. Knapke's report with his counsel present, stating, "this shouldn't be going on with him in my presence. There is an ongoing investigation. It's improper for him even to be here." The court explained to Bowen that it "needed" Dr. Knapke's opinion regarding Bowen's competency "before we can move further forward" and requested that Bowen sign a release for his mental health records. In response, Bowen renewed his request for a new lawyer, refused to sign the release

---

[3] As the court had earlier explained, it did not believe it could conclude the *Marsden* hearing until it ruled on Bowen's competency; otherwise, "if we hear *Marsden* motions from people that are incompetent, we get nowhere fast."

11

allowing his counsel to review the records, but explained, "I'd be more than happy to do that with a new attorney." The court repeated its view that the issue of Bowen's competence must be resolved before proceeding with another *Marsden* hearing and reiterated its request that Bowen sign a release form for his medical records.

When Bowen again refused to sign the release form, the court told Bowen, "You're being obstreperous . . . . You're being stubborn." Bowen responded, "This is not stubborn. This is someone [Handler] being investigated for criminal conduct [based on Bowen's complaint to the State Bar]. I should be granted a new attorney. Don't I have a right to adequate representation, not someone who's in an ongoing investigation right now?" The court reiterated, "I have to resolve the issue about whether or not you're competent to be sentenced."

Amid this discussion, the prosecutor "clarified" the People's position that "we believe that he's competent" and "based on his refusal to and Dr. Knapke's report, the People are also changing their recommendation for sentencing" on the recommendation of a "supervisor" from a probation sentence to instead "requesting that the court sentence him to high term."

This statement prompted Bowen to request the People's updated sentencing memorandum for himself and a copy sent to the "State Bar at their request" because "I think I have a right to the memorandum, right, and review it with my fucking sheister [*sic*] attorney." After the court admonished Bowen to be respectful, Bowen continued, "Well, if I could get a new attorney, I would really appreciate it. This guy is being investigated. I'm not getting the joke on why I'm not being granted a new attorney. Am I really supposed to go forward on a sentencing hearing and

all the other motions I need to have done with somebody who has violated multiple codes of professional responsibility and ethics violations?"

After Bowen again asserted that any sentencing would be unfair if he did not have a new attorney, the court invited both counsel to submit on the section 1368 issue so the court could rule on it. The People submitted, and Handler declined to submit, given Bowen's objection. Bowen then confirmed with the court that the court had both his letter to the State Bar complaining about Handler, and the State Bar's response that the complaint had been forwarded for investigation.

The court then asked Bowen directly if he would submit on Dr. Knapke's letter and allow the court to decide Bowen's competency, or alternatively, if he would insist on a jury trial on the competency issue. The court explained that if Bowen agreed to submit on Dr. Knapke's letter (i.e., waive his jury trial right) and allow the court to decide Bowen's competence "right now" the court would then "go into a closed hearing where you can tell me more about your complaints about Mr. Handler's performance."

Bowen then asked, "So is this criminal procedure that because I'm incompetent and somebody is being investigated for criminal – I still don't have a right to adequate representation?" The court responded that due to Bowen's statements in court and in his letters, the court had to "resolve the issue now because you caused me to find I had a doubt as to your competency." Bowen inquired whether Handler would be the one representing him in a jury trial to determine competency, which the court confirmed would be the case. Bowen declared that proposition "absurd, with all due respect" and chose to proceed with a jury trial on the competency issue. Bowen then attempted to discuss another

13

"follow-up letter from the State Bar of California," leading to an objection from the People that the court sustained and then went off the record.

When the court went back on the record, it explained that "we had to clear Mr. Bowen from the courtroom because he was not going to let anyone else speak." After conferring with counsel about how to proceed, including concerns about COVID-19 impacts to setting jury trials, and Handler's concern that Bowen would soon (September 21, 2020) be time-served even on a maximum sentence, the court then set a further date of July 30 as a "[section] 1368 readiness conference" and to decide then "when to set it for a jury trial with regard to competency."

E. *The Court Declines To Hear or Rule on Bowen's* Marsden *Motion*

When the parties reconvened on July 30, 2020, Handler had subpoenaed and obtained Bowen's mental health records, but he objected on Bowen's behalf on privacy grounds to the court reviewing them. Handler also reported that Bowen "told me not to have any ex parte proceedings in his case." In response to the privacy objection, the court excluded the prosecutor from the courtroom. In the confidential session, Bowen maintained his objection to sharing the mental health records with the court. After Handler confirmed the records did contain mental health information, the court ordered Handler to provide the records to the court for in camera review over Bowen's objection "because they may shed light on the issue of competency."

Back in open session, the court invited Handler to address a bail motion seeking Bowen's release primarily on the grounds that the appointed doctors needed the transcript from one of the

14

sealed *Marsden* hearings to complete an evaluation of Bowen's competence, which would in turn delay the competency trial past the date when Bowen would be time-served on a maximum sentence. In the course of that discussion, Handler disclosed that Dr. Bangston believed Bowen "might be incompetent due to the stress he's currently under with the pandemic, being incarcerated and having been convicted."

The court then reported that after its review in camera of the mental health records it saw "nothing in the records" that "contain a definitive diagnosis. It's all about possibilities." Handler agreed, "They refer to a possible diagnosis that sometimes can have psychotic features that weren't present at that time."

The court then reversed its position regarding Bowen's competency:

> "Court: I realize that we've all, over the last three months since April 29th when I declared a doubt based on Mr. Bowen's bizarre statements in court, and we've done a lot of work on this issue, but I have to tell you that I am at this point of a different mind. I do not believe that there was substantial evidence to support a reasonable doubt as to his incompetence back then on April 29th nor do I believe it now."

Citing *People v. Danielson* (1992) 3 Cal.4th 691, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, the court declared "more is required to raise a doubt of incompetence than mere bizarre actions or bizarre statements or an indication of possible underlying depression."

15

(*Id.* at pp. 726-727.)  Finding "that's what we have here," the court stated it was "in a position to appraise whether Mr. Bowen's conduct in court amounts to incompetence or an attempt to delay the proceedings."  The court proceeded to find the latter:

> "Court:  Given that his bizarre statements were made in the context of repeated requests for the court to appoint another attorney, and the fact that his requests for a new attorney had been written in a manner that shows he understands the nature of the proceedings, because he has coherently recited instances in his mind of his attorney's mistakes, I now find that the defendant could cooperate with his attorney at sentencing if he wanted to do so.
>
> "I also now find that the defendant understands the nature of his sentencing hearing because he has made clear his preference to be released on probation. The bizarre statements he made in court do not support a doubt as to his incompetence, but simply, in my mind, amount to an attempt to manipulate the court to delay the proceedings and give him the new attorney that he wants.
>
> "Based on these findings, I now find that there does not exist and never existed substantial evidence of a reasonable doubt as to the defendant's incompetence to be sentenced.
>
> "We will now proceed to sentencing."

Handler then confirmed that "if he's – the court is deeming him competent, the next thing we would have to do is do his *Marsden* hearing before proceeding to sentencing –" and the court agreed, "Yes." After a recess, Handler disclosed that Bowen had "authorized me to let the court know that he believes he has a prior diagnosis of schizoaffective disorder" and other locations existed that may have related mental health records. In addition, Handler explained the defense had not completed its investigation of places that may have treated Bowen for mental illness, nor had Dr. Bangston completed her evaluation because she did not yet have the transcript of the prior *Marsden* hearing. Dr. Bangston did believe that Bowen's "narcissistic or borderline personality disorders when they come up against a factual situation where they aren't expecting, such as, being convicted in a case where they didn't expect to be convicted, can place someone into a state of psychosis."

The court rejected these arguments, stating, "I believe and I still find that his dragging his feet and refusing to cooperate and meet with the doctors is part and parcel of his attempt to delay the proceedings." With the prosecutor present, the court then asked Bowen if he wanted another *Marsden* hearing, to which Bowen responded that he did, and that it would take "the greater part of a day" based on "50 pages plus" he had prepared, leading to the following colloquy:

> "Court: Without telling me the details, these are errors that you say he committed when? At what stage?

17

"[Bowen]: When? All throughout the fucking trial, nonstop.

"Court: I've heard all of your complaints –

"[Bowen]: No, you haven't. You heard some of them.

"Court: -- about errors at the trial. This is –

"[Bowen]: You heard about very little –

"Court: -- this is not about the trial.

"[Bowen]: -- and I'm about to give you the mother lode of corruption, and I have hard evidence of collusion. This is going to come down on the DA, I can tell you that. I would be hard pressed if [the DA] will have a job after this is revealed to the public, but this collusion that is taking place between the public defender's office and the DA, I have hard evidence . . . I mean, we're talking – this is career ending shit I have. It's really bad. Collusion since day one, and I've caught Mr. Handler in quite –"

At this point Handler interceded to ask if the court should go into confidential session without the prosecutor present. The court responded that Bowen "does not get to choose . . . . We have dedicated hour upon hour upon hour regarding his complaints about the trial . . . . He's had more than enough opportunity for that. I'm denying the *Marsden*." Then this colloquy:

18

"[Bowen]: Oh, my fucking God, this is corruption. Goddamn. This shit is going to come down on the – you bet your ass. Watch this shit. Watch when everybody sees the kind of corruption that – I have hard evidence—

"Court: Mr. Bowen, unless you can control yourself and let proceedings take place, I'm going to exclude you.

"[Bowen]: Well, you're excluding me from having my right to a *Marsden* hearing and from making a proper record of – I have evidence of corruption, Your Honor, and I have many matters –

"Court: This is my fourth warning. I can and will remove you from the courtroom unless you're quiet and let proceedings take place."

Handler then interceded again to argue that Bowen had the "due process right to at least be heard as to a *Marsden* hearing," that Bowen had been preparing for the *Marsden* hearing "for months now" and urged the court "at least give him an opportunity to see if he has anything new" because "this case was calendared once for a Marsden hearing, I think at the very least we need to give him an opportunity outside the presence of the People."

After denying Handler's suggestion the court was "frustrated," the court stated, "I'm denying your request and overruling your objection. There will be no *Marsden* hearing.

19

We've had enough already." After more profanity from Bowen, the court ordered Bowen removed from the courtroom.

F. *The Court Adopts the People's Changed Recommendation and Sentences Bowen to State Prison*

With Bowen excluded from the courtroom, the court proceeded with sentencing. Handler objected to proceeding in Bowen's absence, urging the court to consider Bowen's outburst as possible corroboration of a "psychological problem." Handler requested a one-day recess to "give [Bowen] a chance to calm down" so he could be present for the new trial motion and sentencing because "I think it would be a violation of due process that might cause reversal to sentence him without at least giving him overnight to calm down." Finding that Bowen would "be the same obstreperous person" who "would just make it impossible to conduct any sentencing or to conduct any hearing on a motion for a new trial" the next day, the court overruled the objection, denied the motion for a new trial, denied Handler's request to bring Bowen back to court, denied the defense request for probation (also the original recommendation from the People), and adopted the People's revised recommendation by sentencing Bowen, in his absence, to the "high term of three years in state prison." The court cited mitigating and aggravating factors. In mitigation, the court referenced that Bowen was not armed and his "relative minor criminal history." In aggravation, the court cited the "nature, seriousness and circumstances of the crime, that the defendant inflicted substantial emotional injury to the victim, that the manner in which the crime was carried out demonstrated sophistication," and that "the defendant committed similar conduct against three prior victims." The court also

20

stated it was "not reasonable to believe that he would comply with terms of probation" and cited "danger to the public" as reasons to deny probation.

When Handler noted, "Your Honor, I think the court has a legal obligation to read him his appellate rights. I have prepared a notice of appeal for him," the court responded "Okay. Then file it and that should take care of it."

Bowen timely appealed.

After initial briefing on appeal, Bowen sought and received leave to file supplemental briefing due to a change in counsel, and also to request resentencing pursuant to a change in the law, Senate Bill No. 567 and section 1170, subdivision (b). The People filed a combined supplemental opposition. Bowen also filed a request for judicial notice of three items omitted from the record on appeal. We treated that request as a motion to augment the record, which we granted over the People's objection.

## DISCUSSION

A. *Bowen Has Not Shown Ineffective Assistance of Counsel or Prosecutorial Misconduct*

Bowen contends we must reverse his conviction due to ineffective assistance of counsel and prosecutorial misconduct. The People respond that Bowen has waived most of the arguments he raises now on appeal and that he has shown no basis for relief regardless.

1. *Bowen has not proven ineffective assistance of counsel*

Bowen contends his counsel provided ineffective assistance, primarily by not further pursuing a motion for mental health

21

diversion (§ 1001.36) after the court rejected the initial request at the preliminary hearing.

"The Sixth Amendment guarantees competent representation by counsel for criminal defendants." (*People v. Holt* (1997) 15 Cal.4th 619, 703.) ""'To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'''" (*People v. Rices* (2017) 4 Cal.5th 49, 80, citing *Strickland v. Washington* (1984) 466 U.S. 668, 694.) "We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*Holt*, at p. 703.) Where the record on appeal does not disclose why counsel made certain decisions, "a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)

Bowen has failed to establish either that Handler's representation fell below an objective standard of reasonableness or the reasonable probability of a more favorable outcome. Bowen contends the court erroneously denied his request for pretrial diversion because the court mistakenly believed the stalking charge did not qualify. Bowen then faults his counsel for not pursuing the diversion request further. However, to make

22

this argument Bowen concedes counsel *did* pursue the mental health diversion.  The record does not reflect why counsel did not pursue it further, leaving us with no basis to question that decision.  Perhaps counsel did not want to antagonize the court by arguing against a ruling the court already had made.  Perhaps counsel knew it stood little chance of prevailing given that Dr. Bangston's report offered no formal diagnosis of any qualifying mental condition.[4]  Perhaps counsel knew, because at the preliminary hearing Bowen had rejected a time-served probation offer that included counseling, that Bowen would not accept a diversion disposition that included years of treatment.  We have no basis to evaluate these decisions, any one of which was a reasonable strategic choice.

Accordingly, Bowen has failed to overcome the presumption that counsel acted reasonably (*People v. Mickel, supra,* 2 Cal.5th at p. 198) or show he would have achieved any better result.

2. *Bowen has not shown ineffective assistance of counsel in responding to prosecutorial misconduct sufficient to warrant a new trial*

Bowen contends the People committed prosecutorial misconduct by, among other things, directly addressing counsel outside the presence of the jury, expressing contempt toward the defense, packing the courtroom with female attorneys, and exceeding the scope of the court's pretrial rulings.  Bowen

---

[4]     The report at issue is Dr. Bangston's February 13, 2020, supplemental report that finds Bowen has "characteristics" of certain disorders but does not diagnose him as having them.  One of these disorders mentioned by Dr. Bangston, borderline personality disorder, is excluded by section 1001.36.

forfeited the bulk of these arguments by not raising them below. (*People v. Prieto* (2003) 30 Cal.4th 226, 259 ["'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'"]; accord, *People v. Crow* (1993) 6 Cal.4th 952, 960, fn. 7.)  Bowen concedes as much, suggesting these instances amount to ineffective assistance of counsel and cumulative error. Regardless, none of the issues Bowen raises has merit.

"'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"" (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.)  "'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.'" (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 563.)  To result in the denial of a fair trial, a prosecutor's conduct must "'[infect] the trial with such unfairness as to make the conviction a denial of due process.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 111; accord, *People v. Prieto, supra,* 30 Cal.4th at p. 260.)

None of the instances identified by Bowen comes close to violating these standards.  Comments to defense counsel outside the presence of the jury obviously can have no effect on the jury or the fairness of the trial.  The comments made about Bowen as an alcoholic and drug user fall within the scope of permissible "vigorous arguments" and reflected the evidence at trial,

24

including from Bowen's own testimony. Regarding "packing the courtroom," nothing in the record reflects who was in the courtroom, but regardless the courtroom is open to the public and both sides generally may invite supporters. (See, e.g., *People v. Ramirez* (2021) 10 Cal.5th 983, 1015, 1019 [presence of nearly two dozen uniformed officers did not violate a defendant's right to a fair trial].) Regarding exceeding the scope of the court's pretrial rulings, Bowen's counsel made no such objection at trial, thereby forfeiting the argument on appeal. Moreover, the prosecutor did not exceed the court's rulings. The court ruled that neither side could go into the details of a prior sexual assault against Lydia. The prosecutor referenced Lydia as having survived a prior sexual assault, but not more. This reference did not violate the court's ruling. Finally, the prosecutor's cross-examination of Bowen did not unfairly prejudice Bowen. Nothing in the cross-examination rose to the level of being deceptive or reprehensible; it was merely vigorous, as the law allows.

B. *Senate Bill No. 567 Requires Resentencing*

We turn next to Bowen's argument that Senate Bill No. 567 requires a new sentencing hearing. At the time the trial court sentenced Bowen, the court had discretion to select a lower, middle, or upper term of imprisonment if it denied probation and if it explained its reasons on the record. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847 (*Sandoval*).) The court here did just that, citing factors in mitigation and aggravation and exercising its discretion to select an upper term. In doing so, the court complied with the law as it existed at the time.

25

The law has since changed.  Relevant here, during the pendency of this appeal Senate Bill No. 567 amended section 1170, subdivision (b).  (See Sen. Bill No. 567 (2020-2021 Reg. Sess.), Stats. 2021, ch. 731, § 1.3; Assem. Bill No. 124 (2020-2021 Reg. Sess.), Stats. 2021, ch. 695, § 5.)  In particular, effective January 1, 2022, the amendments make the middle term the presumptive term of imprisonment absent certain circumstances not present here.[5]  Ameliorative changes, such as those to section 1170, subdivision (b), which limit a court's ability to impose an upper term, apply retroactively to nonfinal judgments.  (*People v. Frahs* (2020) 9 Cal.5th 618, 628.)  Bowen argues the ameliorative changes to section 1170, subdivision (b), apply retroactively to his sentence.  The People concede the point, and we agree.  (See *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109 (*Zabelle*) ["section 1170's current statutory language applies retroactively in all nonfinal cases"]; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038-1039 [section 1170 amendments apply retroactively to a defendant whose conviction is not yet final].)

Bowen contends we must remand for resentencing in light of Senate Bill No. 567 because he did not stipulate to, and the People did not prove beyond a reasonable doubt to the jury, any of the circumstances in aggravation upon which the trial court

---

[5]     Section 1170, subdivision (b)(2), now provides in relevant part:  "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

26

relied when imposing the upper term. The People concede they did not plead and prove by a reasonable doubt at trial, and Bowen did not stipulate to, specific "circumstances in aggravation." However, relying on *Chapman v. California* (1967) 386 U.S. 18 and *Sandoval, supra,* 41 Cal.4th 825, the People argue the resulting error is harmless beyond a reasonable doubt because a jury would have found the aggravating circumstances true beyond a reasonable doubt. Bowen has the better argument.

The trial court may not impose an upper term sentence based on facts not determined by the jury beyond a reasonable doubt. (*Cunningham v. California* (2007) 549 U.S. 270, 274.) However, as the People argue, we may consider so-called "*Cunningham* error" harmless if we conclude "beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury." (*Sandoval, supra,* 41 Cal.4th at p. 839; *Zabelle, supra*, 80 Cal.App.5th at p. 1111.) The Supreme Court has granted review in *People v. Lynch* (May 27, 2022, C094174 [nonpub. opn.], review granted August 10, 2022, S274942), to determine the appropriate standard of prejudice applied by a reviewing court when deciding if it should remand a case for resentencing in light of the amendments to section 1170, subdivision (b). Pending that decision, we rely primarily on the analysis set forth in *Zabelle*, as follows: If the trial court relied on more than one aggravating circumstance, we must determine "for each aggravating fact, . . . whether it is reasonably probable that the jury would have found the fact not true" and "then, with the aggravating facts that survive this review, . . . whether it is reasonably probable that the trial court would have chosen a

27

lesser sentence" had it considered only the smaller subset of aggravating facts. (*Zabelle,* at p. 1112.)

The trial court cited four circumstances in aggravation. Three of them—the nature, seriousness and circumstances of the crime, the infliction of substantial emotional injury, and sophistication of the crime—involve subjective determinations by the jury that require "an imprecise quantitative or comparative evaluation of the facts." (*Sandoval, supra,* 41 Cal.4th at p. 840.) As *Sandoval* warned, these types of "vague or subjective standard[s]" make it difficult to "conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Id.* at p. 840.) We also cannot "assume that the record reflects all of the evidence that would have been presented had aggravating circumstances been submitted to the jury." (*Id.* at p. 839.)

These warnings resonate here. While the jury convicted Bowen of the single stalking count, we cannot conclude it would also have found the "nature, seriousness and circumstances" of the crime as an aggravating factor. Bowen put forward mitigating evidence that could have influenced the jury, such as that he struggled with alcoholism and engaged in the conduct at issue here while drunk and did not intend to harm or scare Lydia. Similarly, "substantial" emotional injury includes the type of vagueness and subjectivity that lessens our "confidence" about what the jury would find. The same is true regarding whether Bowen acted with "sophistication." Jurors conceivably could regard as sophisticated Bowen's creation of multiple online dating profiles and his use of social media websites to communicate with Lydia after she blocked him. However, as Bowen points out, whether a particular juror would consider that

28

conduct "sophisticated" may depend on the juror's own background or perception about baseline computer competency in today's digital world.  Bowen's counsel may also have approached that evidence differently had he known the People needed to prove those facts beyond a reasonable doubt to the jury, rather than by a preponderance of the evidence to the court.

But even if we concluded that the jury would have found one of these factors true beyond a reasonable doubt, unless we make that same finding for all factors upon which the trial court relied (which we do not), we must still reverse unless we can conclude it is reasonably probable the trial court "*would* have imposed the upper term sentence even absent the error" of relying on improper circumstances.  (*Zabelle, supra,* 80 Cal.App.5th at p. 1112.)  Here, we cannot say with confidence it is reasonably probable the court would have reached the same sentencing decision if it could rely on fewer than the four aggravating circumstances it applied.  First, some evidence suggests the state prison sentence was a "close call."  (*Id.* at p. 1115.)  For the duration of the case up to that point, the People had sought a probation sentence.  The probation department also recommended probation, not state prison.  The change to recommending a state prison sentence occurred only when the People perceived Bowen as malingering, refusing to meet with the doctors, and insisting on multiple, long *Marsden* motions.  At a minimum, the record does not disclose any other changes in circumstances to explain the new recommendation.  With fewer factors in aggravation, both the People and the court may have reverted to the original recommendation.  In addition, the court did not weigh any factor against the other, leaving us to speculate about any impact fewer aggravating facts may have

29

had on the trial court's decision-making. (*Ibid.*; *People v. Lopez* (2022) 78 Cal.App.5th 459, 468 [remand required where trial court relies on "long list" of aggravating factors but gives no indication of what decision it would make if fewer factors are available].) Finally, the court did consider certain factors in mitigation (Bowen's insignificant criminal record and that he was not armed). We cannot say with any certainty how the court would have balanced fewer aggravating factors against these existing mitigating factors.

Accordingly, although the court properly sentenced Bowen under the law as it existed at the time (subject to our discussion about the *Marsden* hearing, below), subsequent amendments to section 1170, subdivision (b), have rendered that sentence erroneous. We cannot say that error is harmless.

Because we remand for resentencing, Bowen's argument that the court erred by excluding him from the sentencing hearing is moot.[6] We also need not reach Bowen's argument that

---

[6]     Bowen also contends the court erred by excluding him from the hearing on the new trial motion (although he does not contend that the court erred by hearing the new trial motion prior to a hearing on Bowen's *Marsden* motion). The court has broad discretion to remove a disruptive defendant. (*People v. Bell* (2019) 7 Cal.5th 70, 116.) The record here amply supports the court's decision to remove Bowen. The court gave at least four warnings while Bowen continued to interrupt and use profane language, as he also did at prior hearings. Although the better practice would have been to adopt Handler's suggestion to give everyone a day to cool off, we cannot say the court abused its discretion by excluding Bowen. Regardless, given the overwhelming evidence of guilt, any error was harmless in that it was not reasonably probable Bowen would have achieved a better

his sentence violates his Eighth Amendment right to be free from cruel and unusual punishment. Bowen asserts he would normally receive two-for-one credit pursuant to section 4019 but has been in custody (combining pre-sentence and post-sentence credits) "nearly two years on a maximum sentence of three years, nearly the ratio required for a violent felony." Bowen, of course, may renew his Eighth Amendment argument if, after resentencing, he again believes his sentence exceeds constitutional boundaries. However, we note that Bowen does not appear to contend the sentence itself violates the Eighth Amendment. To the extent he does, a statutorily permitted upper term sentence, considering all the circumstances of the case, would not appear to violate the "concept of proportionality" that is "central to the Eighth Amendment" or appear "grossly disproportionate" to Bowen's crime. (*Graham v. Florida* (2010) 560 U.S. 48, 58-59; accord, *In re Palmer* (2021) 10 Cal.5th 959, 965.) Whether any new sentence violates the proportionality rule in light of Senate Bill No. 567 will be for the trial court to determine on remand. Bowen also offers no specifics as to why he believes his credit calculation violates the Eighth Amendment. In that regard, we further note that section 4019, cited by Bowen for the proposition that his sentence violates "his most basic constitutional right to have a punishment that fits the crime," does not automatically confer double credit to any prisoner. To earn the credits, a prisoner must comply with reasonable rules and regulations, among other metrics, as determined by the sheriff. (§ 4019, subd. (c).) The record submitted by Bowen discloses no details about these calculations. To the extent

_____

result if he attended the hearing. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Bowen again asserts error in the calculation of his credits after resentencing, he must demonstrate an effort to correct the error first in the trial court. (*People v. Fares* (1993) 16 Cal.App.4th 954, 958 ["The most expeditious and, we contend, the appropriate method of correction of errors of this kind is to move for correction in the trial court."].)

   C. *The Marsden Motion and Competency Hearing*

Bowen also contends the court erred by refusing to consider his *Marsden* motion after the court suspended criminal proceedings pursuant to section 1368 and prior to then finding him competent. Because Bowen's "unequivocal" requests for new counsel occurred after the guilty verdict, but before sentencing, and because he will have a new sentencing hearing, we need not decide whether any error by the court in handling the *Marsden* and competency hearings prejudiced Bowen.[7] However, because these issues may arise again on remand, we provide guidance for the trial court on each of them.

---

[7] Even if we find that the court erred in failing to hear Bowen's *Marsden* motion, the People "must carry the burden of showing" that error "is harmless beyond a reasonable doubt." (*Gamache v. California* (2010) 562 U.S. 1083; accord, *Marsden, supra,* 2 Cal.3d at p. 126, citing *Chapman v. California, supra,* 386 U.S. 18.) The People contend any error in not conducting a *Marsden* hearing is harmless. Bowen argues the error cannot be harmless because evidence suggests he may have obtained a different sentencing outcome, he never had the chance to actually air his grievances, and evidence supported his claims of ineffective assistance of counsel. We addressed the ineffective assistance of counsel issues above. Bowen will have the opportunity to argue for a different sentencing outcome now in light of our remand pursuant to Senate Bill No. 567.

1. *The court must provide a confidential* Marsden *hearing, even during section 1368 proceedings*

"The law governing a *Marsden* motion 'is well settled. "When a defendant seeks to discharge [the defendant's] appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of [the defendant's] contention and to relate specific instances of the attorney's inadequate performance."'" (*People v. Memro* (1995) 11 Cal.4th 786, 857, overruled on other ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) The refusal to consider a defendant's request for the appointment of a new lawyer directly implicates the Sixth Amendment right to a fair trial. (*People v. Abilez* (2007) 41 Cal.4th 472, 490.)

We review the denial of a *Marsden* motion under an abuse of discretion standard. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.) Denying a *Marsden* motion "'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]'" (*Ibid.*) However, denial of a *Marsden* motion—let alone the failure to hold such a hearing—implicates federal constitutional issues, namely "'the defendant's Sixth Amendment right to counsel.'" (*People v. Smith* (2003) 30 Cal.4th 581, 606.)

"[T]he decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (*Marsden, supra,* 2 Cal.3d at p. 123.) However, "a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate

33

specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney." (*Id.* at p. 124.)

Here, the court mistakenly believed it needed to decide Bowen's competence prior to hearing his *Marsden* motion. The law is the opposite. In the section 1368 context, a trial court errs when it "brushe[s] aside . . . requests for substitution of counsel in the belief" that it must first resolve "the question of defendant's competence to stand trial." (*People v. Taylor* (2010) 48 Cal.4th 574, 600.) A defendant's right to a *Marsden* hearing survives the declaration of a doubt as to the defendant's competency to stand trial pursuant to section 1368 when "'there is a sufficient showing that the defendant's right to the assistance of counsel would be substantially impaired if [the defendant's] request was denied.'" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 87-88.) Before hearing Bowen's *Marsden* motion the court needed only to decide whether Bowen had made a sufficient showing that a denial of his request could substantially impair his right to the assistance of counsel. He had.

When a *Marsden* request involves a breakdown in the attorney-client relationship, we consider three factors: "'"(1) timeliness of the motion; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense."'" (*People v. Smith, supra,* 30 Cal.4th at p. 606.)

As to the first factor, Bowen timely made his request – repeatedly. The court had ruled on two prior requests when Bowen made a third request the court started to hear on April 29, 2020. But the court never finished that hearing or ruled on

34

Bowen's request because in the middle of that hearing the court declared a doubt as to Bowen's competence, then mistakenly believed it could not proceed with a *Marsden* hearing during the resulting suspension of criminal proceedings. Each succeeding time Bowen appeared in court, he again requested new counsel. He wrote lengthy letters to the court requesting new counsel. He objected to the court considering various substantive matters – the bail hearing, his mental health records, his motion for new trial, sentencing – without first hearing and ruling on his *Marsden* request. In each instance, Bowen timely objected.

As to the second factor, the court did not adequately investigate Bowen's complaint. Following the aborted *Marsden* hearing on April 29, 2020, the court never afforded Bowen an actual hearing at which the court listened to and evaluated Bowen's complaints. At subsequent hearings in May and June, the court put off Bowen's repeated requests for a *Marsden* hearing, erroneously believing it could not proceed without first resolving the issue of competency. On at least two occasions, the court used Bowen's pending *Marsden* hearing request to attempt to coerce Bowen into cooperating with the psychiatrists appointed to evaluate him and into releasing his mental health records to Handler. In doing so, the court improperly sought Bowen's waiver of a constitutional right "not subject to negotiation by the court." (Cf. *People v. Collins* (2001) 26 Cal.4th 297, 309 [court could not bargain with defendant over waiver of right to jury trial].)

At the final appearance on July 30, 2020, after the court withdrew its declaration of incompetency, the court turned to the *Marsden* motion but failed to give Bowen an opportunity to air his complaints in a confidential setting. This, despite the court's

35

repeated earlier acknowledgements that Bowen had a right to a hearing on his *Marsden* motion. ("The *Marsden* is a *Marsden,* and I believe it takes precedence over any other legal ruling or issue.") Instead, finding Bowen had "more than enough opportunity" to articulate his complaints about the trial, the court denied the *Marsden* motion and stated, "There will be no *Marsden* hearing. We've had enough already."

We acknowledge the court had received multiple lengthy letters from Bowen by then. (In fact, the court used those letters as a basis to declare Bowen competent and reinstate criminal proceedings.) We further acknowledge Bowen disrupted multiple proceedings with his accusations against Handler (among others), his interruptions, and his profanity. Nevertheless, refusing to hear Bowen in a confidential hearing violated the constitutional mandate for an "adequate inquiry."

Finally, the court had ample evidence to support the conclusion that the relationship between Handler and Bowen had deteriorated beyond repair. For example, Bowen had submitted multiple complaints about Handler to the State Bar. Bowen also had leveled multiple accusations of unethical conduct against Handler, including collusion with the district attorney. Bowen advertised a purportedly long list of complaints about Handler's performance. We cannot predict how the court would have ruled had it convened an actual *Marsden* hearing (in part because we do not know what more Bowen would have said if given the required hearing). The court may well have concluded that Handler had behaved appropriately, and that Bowen's purported complaints about Handler amounted to, as the court concluded in open session, "foot dragging" and an "attempt to delay the proceedings." But the court had the obligation to consider

Bowen's complaints in a confidential *Marsden* hearing, at least until the court could satisfy itself that Bowen had no new or valid complaints to raise. (*Marsden, supra,* 2 Cal.3d at p. 123 ["the trial court cannot thoughtfully exercise its discretion . . . without listening to [the defendant's] reasons for requesting a change of attorneys."].)

Bowen's motions "straightforwardly invoked the court's duty to hold a hearing on his *Marsden* motion before adjudicating his competency." (*People v. Solorzano* (2005) 126 Cal.App.4th 1063, 1070.) The court had an obligation to decide that issue in a confidential hearing and to do so before deciding the competency issue.

2. *The court must hold a section 1368 hearing after declaring a doubt as to defendant's competency*

Bowen does not expressly challenge the court's failure to hold a competency hearing. However, in his *Marsden* argument, Bowen criticizes the court for "abruptly chang[ing] course" and finding Bowen "competent without any additional evidence or information, including the court ordered doctor's report." The People responded to that comment by defending the court's handling of the competency issue. Given that the issue may arise on remand, we note for any further proceedings that once the court declares a doubt as to a defendant's competence to stand trial, even if "the court's initial expression of doubt . . . was mitigated" by subsequent evidence, that does not "permit the trial court to vacate or otherwise ignore its previous order for a section 1368 hearing." (*People v. Hale* (1988) 44 Cal.3d 531, 541.) Thus, prior to sentencing Bowen, the court should have first held a confidential *Marsden* hearing, then held a competency hearing

37

or trial, depending on Bowen's preference after the court and parties had received the reports from both doctors ordered by the court.

A competency hearing (or trial) may well have proved the court correct in its assessment that Bowen feigned incompetence to delay the proceedings. However, once the court declared a doubt and suspended proceedings, other than as to the *Marsden* issue it had "no jurisdiction to proceed with the case against the defendant without first determining his competence in a section 1368 hearing." (*People v. Hale, supra,* 44 Cal.3d at p. 541; accord, *People v. Westbrook* (1964) 62 Cal.2d 197, 204 ["It is no answer that the trial judge may have resolved his previously expressed doubt on receipt of [additional evidence]. [¶] The trial judge having once expressed his doubt, and set the machinery in motion, could not divest defendant of his right to have the issue tried as contemplated by the statute."]; see *People v. Stankewitz, supra,* 51 Cal.3d at pp. 87-88.)

The trial court relied on *People v. Danielson, supra,* 3 Cal.4th 691, when it reversed its declared doubt. In *Danielson,* the trial court did not err when it failed to hold a competency hearing. However, unlike here, the court in *Danielson* never declared a doubt as to the defendant's competence in the first place, never suspended criminal proceedings, and never formally ordered psychological reports pursuant to section 1368 to determine the defendant's competence.[8] Thus, the rules

---

[8]    *People v. Ghobrial* (2018) 5 Cal.5th 250, relied on by the People, is distinguishable for a similar reason. In *Ghobrial,* as in *Danielson,* the trial court never declared a doubt in the first place. The issue on appeal involved whether the trial court

regarding the jurisdictional impact of declaring a doubt as to competence never entered the equation in *Danielson*. We doubt the court can avoid those jurisdictional issues with a simple "never mind" ruling—weeks later—that no basis existed for its declaration of doubt in the first place. Moreover, unlike the court here, the judge in *Danielson* did consider expert psychological reports in deciding whether to declare a doubt as to the defendant's competence.[9]

In Bowen's case, although Dr. Bangston had issued a prior report, neither of the two experts appointed by the court to render an opinion regarding Bowen's competence had yet provided those reports. As to Dr. Bangston, Handler represented that she believed Bowen might now qualify as incompetent due to the changed circumstances since her last report, but the court did not allow her time to render that opinion. As to Dr. Knapke, the court correctly assessed that he had overstepped his role when he opined that a legal presumption of competence applied merely because Dr. Knapke could not interview Bowen after the first try. But the correct response was not then to jettison the opinions of Drs. Knapke and Bangston altogether. The court had an obligation to work with both appointed experts in an effort to get

---

abused its discretion in not ordering a competency hearing, a decision accorded ""great deference."" (*Ghobrial,* at p. 269.)

[9]     Although the court stated it based its doubt only on Bowen's in-court statements, other objective indicia supported the court's doubt: a history of mental illness in Bowen's family, a history of mental health treatment (albeit apparently inconclusive), indications from at least one doctor he may have a mental health diagnosis, and, arguably and as urged by Handler, the basis for the last *Marsden* not heard by the court.

an actual opinion regarding Bowen's competence, and to then hold an actual competency hearing.

## DISPOSITION

The conviction is affirmed. The judgment of the superior court is reversed, and the sentence is vacated. The cause is remanded with instructions to hold a *Marsden* hearing if Bowen is represented by Handler on remand (or upon any appropriate motion made as to any other counsel).[10] If Bowen demonstrates either ineffective assistance of counsel or an irreconcilable conflict at a *Marsden* hearing, the court shall appoint new counsel and allow that counsel an opportunity to file any appropriate motions. Once the *Marsden* issue is resolved, then the court shall resentence Bowen consistent with the provisions of section 1170, subdivision (b)(2), and any other applicable recent ameliorative legislation. If either the court or defense

---

[10] We do not conditionally reverse the judgment, as we did in *People v. Armijo* (2017) 10 Cal.App.5th 1171, because here Senate Bill No. 567 requires a new sentencing hearing and judgment regardless.

counsel declares a doubt pursuant to section 1368 and the court suspends criminal proceedings, doing so shall not delay any pending or subsequent *Marsden* motion.


HOWARD, J.*

We concur:


PERLUSS, P. J.


SEGAL, J.

---

\*     Judge of the Marin County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.